## CIRCUIT COURT OF WARREN COUNTY

Cherokee Corp.,
Trustee, et al.

v.

Chicago Title Ins. Corp. et al.

January 11, 1995

Case No. (Law) L93000228

By Judge Paul M. Peatross, Jr.

### Procedural Background

This case was filed as a Motion for Judgment on the law side of the court in the name of Cherokee Corporation, Trustee, et al. By order of this Court entered on October 11, 1994, as to the claim against James A. Drown, Substitute Trustee, this action was transferred from the law side of the court to the equity side of the court pursuant to § 8.01-270. By separate order of this Court entered on December 9, 1994, the claim against Capital Skiing Corporation by Cherokee of Linden, Virginia, Inc., was transferred from the law side of the court to the equity side of the court pursuant to § 8.01-270, except for those matters pertaining to damages. Capital Skiing Corporation was a necessary party for the equity proceeding because it was record owner of the property at issue.

A hearing was held on the claim of Cherokee of Linden, Virginia, Inc., hereinafter referred to as "Cherokee," on January 5, 1995, in the Circuit Court of Warren County regarding the actions of James A. Drown, Trustee, as to whether or not the foreclosure sale of November 30, 1992, should be set aside. The Court took the matter under advisement to consider the authorities cited by counsel.

*Factual Findings*

Ronald Eugene Adkins is the principal owner of Cherokee of Linden, Inc., a Maryland corporation doing business in Virginia under the name of Cherokee, Inc. On May 4, 1989, Cherokee purchased approximately 1,050 acres of mountainous acreage near Front Royal in Warren County, Virginia, through a series of deeds from the estate of John W. Marshall for $900.00 per acre, which Mr. Adkins intended to develop into a ski resort.

Improvements were done to the property to complete the ski resort, including construction of ski lifts by Riblet Tramway, Inc., and snow-making equipment was installed by Snow Machines, Inc., which resulted in nonpayment by Cherokee and mechanic's liens being filed against the project in 1990. Improvements were also made to the property by Crawford Electronics, Inc., for electrical work and by L. L. Franklin & Sons, Inc., for excavation work done to improve the property.

After a mechanic's lien suit was filed in the Circuit Court of Warren County, a consent decree was entered on February 5, 1991, regarding the debts of Riblet Tramway and Snow Machine granting judgment in favor of those creditors. When default occurred in payment of those debts, the creditors sought enforcement of the mechanic's liens.

In June of 1991, Cherokee filed a Chapter 11 bankruptcy proceeding to halt the state law proceedings to enforce the mechanic's liens. Under the terms of a bankruptcy court order of March 3, 1992, Cherokee and Occoquan Land Development Corporation agreed to place a first lien deed of trust to secure the payment of creditors, and a deed of trust was executed on March 26, 1992, to secure various creditors in the principal amount of $1,467,165.13, together with interest, costs, reasonable attorney's fees, disputed amounts, etc., as set forth on "Schedule H" attached to the deed of trust. Later the creditors formed a company called Capital Skiing Corporation and assigned their obligations to that corporation. Cherokee and Occoquan defaulted in the payment of the obligation secured by this deed of trust, and after further proceedings in bankruptcy court, the bankruptcy court permitted the foreclosure sale to go forth. It was scheduled for November 30, 1992, by substitute trustee, James A. Drown. The deed of trust was introduced at the hearing on January 5, 1995, as plaintiff's Exhibit 3. The sale on November 30, 1992, was advertised as required by law in the *Northern Virginia Daily*, a newspaper of general circulation. The advertisement for sale was introduced as an exhibit, plaintiff's Exhibit 2, in the hearing of January 5, 1995.

In that advertisement, it was noted that the substitute trustee intended to make available at sale a commitment for an owner's title insurance policy to be issued by Chicago Title Insurance Corporation. No title insurance had been obtained on the property when Cherokee purchased the property in 1989. A title insurance commitment from Chicago Title Insurance Company was issued on July 13, 1992, per defendant's Exhibit 1 with cover letter of July 30, 1992, introduced at the hearing on January 5, 1995.

Approximately one week prior to November 30, 1992, David Downes, an attorney in Front Royal, called Mr. Drown and told him about a competing claim of title to 350 to 400 acres of the approximate 1,050 acres he was about to sell at the foreclosure sale, which is the land in question in this suit. Upon receiving this information, Mr. Drown called Jeffrey Stedfast, an attorney representing Capital Skiing Corporation, who was the note holder on the deed of trust, and advised him of the claim of title reported to him by David Downes. Jeffrey Stedfast testified on January 5, 1995, that he called Eric Adamson, the agent for Chicago Title Insurance Company, to determine if he knew of any claim of title of one Lucille O'Bannon to 350 to 400 acres of the 1,050 acre tract of the property in question.

When Mr. Stedfast arrived for the auction on November 30, 1992, he went by Mr. Adamson's office and picked up a copy of the title insurance binder, which is defendant's Exhibit 1. There was no exception noted as to any claim of title by Lucy O'Bannon, which was the subject of the telephone call from David Downes.

The testimony of Steve Adkins, son of Ronald Eugene Adkins, owner of Cherokee, showed that he searched the title to the 1,050 acres in 1984 and had a concern about a claim to 350 to 400 acres devised under the Kaiser will. The question under the Kaiser will was whether John W. Marshall had title to the property or the 350 to 400 acres was left to Lucy O'Bannon, the residuary devisee. Despite the concern of Steve Adkins, his father purchased the property in question from the estate of John W. Marshall in 1988 on advice of his attorneys that there was no problem as to the title regarding any claim of Lucille O'Bannon.

The evidence also showed that Ronald Eugene Adkins had borrowed $100,000.00 from his friend, Edward Raney, to improve the ski resort. Sometime prior to November 30, 1992, Ronald Eugene Adkins contacted Lucille O'Bannon, who is now Lucy O'Bannon Caudill, and told her of her possible ownership in the 350 to 400 acres tract. Mr. Adkins proposed that she deed any interest she had in this land to Edward Raney, his friend,

4

for the sum of $350,000.00 if it were shown that she had actual title to the property. The evidence showed that David Downes represented Mr. Raney in the preparation of a deed, which was prepared and executed on November 28, 1992, two days prior to the auction. The evidence also showed that David Downes called Mr. Adamson sometime on or before November 30, 1992, and that at 11:00 a.m. on November 30, 1992, an exception to the title insurance commitment was delivered to Mr. Drown on the steps of the courthouse at the time the auction advertisement was read. This endorsement was introduced as plaintiff's Exhibit 1 and took exception to any claim of interest by Lucy O'Bannon to the 350 to 400 acres of the land in question.

Upon receipt of this document, Mr. Drown announced that he was postponing the auction for a half hour and went into the clerk's office to confer with Mr. Stedfast, counsel for Capital Skiing Corporation, and Mr. Adamson, agent for Chicago Title Insurance Corporation. In the first half hour, Adamson or Stedfast called the main office of Chicago Title to see if they would withdraw the exception to the claim of title by Lucy O'Bannon. At approximately 11:30 Mr. Drown went back out to the 30 to 50 people assembled for the auction, who were present at 11:00 o'clock, and announced that the auction would be postponed for an additional half hour. Mr. Drown then conferred again with Mr. Stedfast and Mr. Adamson to see if Chicago Title would withdraw the exception as to the O'Bannon claim of title. After contact was made with the main office of Chicago Title, it was determined that Chicago Title would not withdraw the exception to the title claim of Lucy O'Bannon. At approximately 12:00 noon or a few minutes after, Mr. Drown appeared on the steps of the courthouse to those assembled and read the exception introduced as plaintiff's Exhibit 1 on January 5, 1995. He then called for bids, and the only bid was the bid of Capital Skiing Corporation submitted in writing by Jeffrey Stedfast on behalf of Capital Skiing Corporation of 1.8 million dollars.

The evidence showed that prior to the auction commencing at 11:00 o'clock, Mr. Drown did announce to the crowd that he requested any bidders to register on forms he had in his possession to hand out to bidders. This announcement was made several times, and no one took a form and registered to bid on the property. One form was distributed at the request of someone in the crowd, but it was not returned with information thereon.

The deed of Lucy O'Bannon to Edward Raney representing the conveyance of any interest she had in the property was put on record at 3:55 p.m. on November 30, 1992, some four hours after the auction was concluded.

The claim of Lucy O'Bannon was not upheld after trial in the Circuit Court of Warren County prior to the hearing of this claim on January 5, 1995. The case was tried to a jury on an issue out of chancery on a full hearing on the merits of the claim. The cloud on title was cleared, and it was determined that Cherokee Corporation did have ownership of the 350 to 400 acres acquired from the estate of John Marshall.

## Questions Presented

1. Did the substitute trustee have a duty to postpone the sale to clear up the cloud on title excepted to in the endorsement by Chicago Title Insurance Company?

2. Did the actions of Ronald Eugene Adkins, principal owner of Cherokee, in bringing forth the claim of Lucy O'Bannon amount to unclean hands barring relief requested by Cherokee to set aside the foreclosure sale?

## Preliminary Rulings

In the original Motion for Judgment, Cherokee alleged that Substitute Trustee Drown breached his duty as trustee as follows:

1. Drown announced to the bidders that Chicago Title would not insure title on the 350 acre tract, which was contrary to the advertisements of sale;

2. Substitute Trustee Drown did not offer the parcels separately as had been advertised;

3. The bid price of 1.8 million represented a small fraction of the value of the property;

4. The manner in which the sale was advertised and conducted resulted in the elimination of other potential bids and insured that Capital Skiing Corporation would acquire the property at an inadequate price;

5. Prior to the auction, Substitute Trustee Drown and Capital Skiing Corporation knew the property exceeded substantially the sum of 1.8 million dollars; and

6. Prior to the auction, Substitute Trustee Drown and Capital Skiing Corporation knew that the cloud on title asserted by Lucy O'Bannon would result in no one bidding on the property except Capital Skiing.

The Court finds from an assessment of the evidence that none of these claims have merit except No. 4, which dealt with the manner in which the sale was conducted. Specifically, as to (1) above, the announcement that Chicago Title would not insure the title on the 350 acre tract as to the claim of Lucy O'Bannon was not contrary to the advertisement of sale. As to (2), the Court does not find that the Trustee had a duty to offer parcels separately as opposed to the land as a whole and did not breach any fiduciary duty. Regarding (3), Plaintiff Cherokee failed to sustain its burden of showing that the price bid of 1.8 million was a small fraction of the value of the property. As to (5), there was no evidence to support the claim that Substitute Trustee Drown and Capital Skiing Corporation knew that the value of the property was substantially greater than 1.8 million, and the evidence supports that Capital Skiing certainly would not have been opposed to a bid greater than 1.8 million as it was not fully compensated by its bid on the property of 1.8 million. Finally, there is no evidence to support that Substitute Trustee Drown and Capital Skiing knew that the cloud on title caused by the announcement that Chicago Title would not insure the title would result in no one bidding on the property. Instead, the evidence supported that no one was present who was interested in signing up to bid on the property at a price in excess of 1.8 million.

### Discussion of Authority

The law is clear in Virginia that a trustee is the agent of the debtor and the landowner. He has a duty to act impartially between them and has a duty at a foreclosure sale under a deed of trust to bring the highest and best price for the property under every possible advantage. The trustee has a duty to use all reasonable diligence to obtain the best price. See *Hudson v. Barnom*, 101 Va. 63 at 66-67 (1903).

As noted by the Supreme Court, a trustee has the following duty:

> He may, and ought to, of his own motion, apply to a court of equity to remove impediments to a fair execution of his trust, to remove any cloud hanging over the title, and to adjust accounts, if necessary, in order to ascertain the actual debt which ought to be raised by the sale, or the amount of prior encumbrances. And he will be justified in delaying for these preliminary purposes the sale of the property until such resort may be had to a court of equity. If he shall fail to do this, the party injured by his default has an unquestionable right to do it — whether such party be the

creditor secured by the deed of trust, or a subsequent encumberor, or the debtor himself, or his assignees.

*Id.* at 67. See also *Muller's Adm'r v. Stone*, 84 Va. 834 (1888).

The sole issue in this case is what action should Substitute Trustee Drown have taken when he was handed the endorsement by Chicago Title excepting to the claim of Lucy O'Bannon shortly after 11:00 a.m. when the advertisement was being read by the auctioneer. Certainly his action was proper to postpone the sale and attempt to get this exception clarified. The evidence shows that his efforts were to attempt to get Chicago Title to withdraw this exception, and efforts were made by Mr. Adamson and Mr. Stedfast to persuade Chicago Title to withdraw it. After approximately one hour of attempts, Chicago Title would not withdraw the exception, and Mr. Drown made the decision to go forward with the auction by announcing the exception to those present who may have bid on the property at the foreclosure sale. Mr. Drown relied on the advice of Mr. Adamson, an experienced title examiner, that the claim of Lucy O'Bannon was without merit, but that information was not known to any potential bidder at the auction. Certainly, the options of Mr. Drown were to postpone the sale and clear up this claim of title or go forward. He also relied on the fact that no one had registered to bid on the property after announcing to the crowd that he needed bidders to register.

However, such an announcement to any potential bidder that there was a cloud on the title could have nothing but a chilling effect in fulfilling the trustee's duty to bring the best possible price at the foreclosure sale and using all reasonable diligence to obtain the best price. A postponement of the sale would have enabled him to clear this cloud on title and re-offer the property. Having decided to read the exception to the crowd gathered for the auction, the net effect was not to encourage the best price for the property at the auction. Therefore, this Court finds that Mr. Drown breached his fiduciary duty in going ahead with the auction after announcing the cloud on title.

The second issue is whether or not Cherokee through Ronald Eugene Adkins, is entitled to complain about the foreclosure sale under the maxim of he who seeks equity must do equity and the maxim that he who comes into equity must come with clean hands. It is clear from the evidence that the question of the title to the property of Lucy O'Bannon was intentionally raised and presented to the trustee by the actions of Ronald Eugene Adkins. It is equally clear to the Chancellor that the purpose of raising this cloud on title was to postpone the foreclosure sale scheduled for Novem-

ber 30, 1992. At first blush, it appears to the Chancellor that Mr. Adkins has "unclean hands" by asking this Court to set aside the foreclosure sale because of the claim of Lucy O'Bannon as owner of a portion of this property when it is unlikely that Ms. O'Bannon would ever have raised a claim of title. Therefore, it seems that the maxims heretofore mentioned clearly bar his right to complain now.

However, the Chancellor must weigh the merits of the claim of Lucy O'Bannon as owner of the 350 acres. Pages 14 and 15 of the trial memorandum of Defendant James Drown give the history of the litigation regarding the claim of title of Lucy O'Bannon. Edward Raney filed suit in the Warren County Circuit Court on the chancery side, which resulted in a trial on an issue out of chancery to a jury. The matter of the claim of title of Mr. Raney through Ms. O'Bannon was given to the jury, and the jury made a recommendation to the Chancellor holding that Mr. Raney did not acquire title from Ms. O'Bannon by deed from her. Therefore, the case went to trial on its merits and was not dismissed on a motion to strike as a "bogus" claim. Therefore, the Chancellor concludes that the claim of Lucy O'Bannon needed to be cleared through the courts in order to assure good title to Cherokee under the deed of trust.

Accordingly, the Chancellor will not bar Cherokee from challenging the foreclosure sale due to unclean hands or failing to be equitable. The relief of setting aside the foreclosure sale held on November 30, 1992, is granted, and a new foreclosure sale is ordered in accordance with the terms of the deed of trust and the laws of Virginia.